UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

SINATRA & COMPANY REAL ESTATE       )
LLC,                                )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Case No. 20-cv-00041
                                    )
NORTHERN SECURITY INSURANCE         )
COMPANY,                            )
                                    )
        Defendant.                  )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Docs. 29 & 30)

Plaintiff Sinatra & Company Real Estate LLC brings this breach of contract action against Defendant Northern Security Insurance Company. Plaintiff alleges Defendant wrongfully denied payment under an insurance policy for certain covered losses stemming from a fire at Plaintiff's property. It asserts three claims: breach of contract/damage to the building (Count I), breach of contract/loss of business income (Count II), and breach of contract/extra-contractual consequential damages (Count III). On February 18, 2022, Plaintiff and Defendant cross-moved for summary judgment. (Docs. 29 & 30.) Pursuant to a stipulated briefing schedule, the parties filed their responses in opposition on March 25, 2022 and replies on April 15, 2022, at which time the court took the pending motions under advisement.

Plaintiff is represented by Christopher M. Berloth, Esq. Defendant is represented by Marco Cercone, Esq.

I.      **The Undisputed Facts.**

        A.      **Damage to the Building Claim.**

        Plaintiff is a limited liability company which, at all relevant times, owned and

operated an apartment complex at 363 Breckenridge Street, Buffalo, New York (the "Breckenridge Street Property"). The Breckenridge Street Property was a two-and-a-half-story, 5,528-square-foot residential apartment building with eleven units, each consisting of a one-bedroom, one-bathroom apartment. Defendant, a Vermont insurance company authorized to do business in New York, issued an insurance policy to Plaintiff, policy number BP28014923 (the "Policy"), which provided coverage for various properties owned by Plaintiff, including the Breckenridge Street Property, for the November 4, 2016 to November 4, 2017 policy period.

On or about September 23, 2017, a fire caused significant damage to the Breckenridge Street Property. Plaintiff submitted a claim to Defendant, who agreed the damage was covered under the Policy.

Under the Policy, Plaintiff may elect to "make a claim for loss or damage covered by this insurance on an actual cash value basis" or "a replacement cost basis." (Doc. 29-2 at 21.) If a claim is "settled on an actual cash value basis," Plaintiff "may still make a claim on a replacement cost basis" if it provides notice of its intent to do so. *Id.* While an actual cash basis claim may be paid out at any time after a covered loss, the Policy provides that Defendant "will not pay on a replacement cost basis for any loss or damage: (i) Until the lost or damaged property is actually repaired or replaced; and (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." *Id.*.

Plaintiff sought coverage on an actual cash value basis and replacement cost basis, pending repair or replacement of the Breckenridge Street Property. The undisputed actual cash value of the Breckenridge Street Property was $493,737.82. In a series of payments, the last of which was made on May 21, 2018, Defendant paid Plaintiff $488,737.82 to settle Plaintiff's actual cash value basis claim. This reflected the $493,737.82 actual cash value less Plaintiff's $5,000 deductible. Plaintiff now seeks the replacement cost holdback, or the difference between the replacement cost and the actual cash value, plus interest.

The Policy defines replacement cost as

[T]he cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

    (i)    The Limit of Insurance under this policy that applies to the lost or damaged property;

    (ii)    The cost to replace, on the same premises, the lost or damaged property with other property:

        i.    Of comparable material and quality; and

        ii.    Used for the same purpose; or

    (iii)    The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

*Id.* at 20.

The parties agree that the value of prong one is $868,498.00 and the value of prong two is $747,368.59. As a result, the maximum potential replacement cost holdback is $253,630.77. The parties dispute whether Plaintiff has "actually repaired or replaced" the Breckenridge Street Property and is thus entitled to payment on a replacement cost basis. The parties also dispute the value of prong three, the amount "actually spen[t] that is necessary to repair or replace" the Breckenridge Street Property. *Id.*

On April 9, 2019, Plaintiff identified an apartment complex located at 101 Lafayette Road, Syracuse, New York (the "Lafayette Road Property") as a proposed replacement for the Breckenridge Street Property. Plaintiff purchased the Lafayette Road Property, which contained over seven hundred residential units, for over fifty-seven million dollars. The closing date on the purchase and sale was on or about July 30, 2018. Defendant's adjuster questioned whether "the purchase of an apartment complex [the Lafayette Road Property] is of similar occupancy to a stand alone building containing 10 residential apartments without any additional amenities[,]" (Doc. 30-17 at 3), and requested the purchase and sale contract for the Lafayette Road Property. Instead of submitting the contract, in May 2019 Plaintiff submitted a purchase and sale contract for an alternative replacement property located at 197 Summer Street, Buffalo, New York (the "Summer Street Property"), which it purchased in 2018 for approximately $825,000. The closing date for the Summer Street Property was on or about October 31, 2018. The

Summer Street Property is three stories, 11,848 square feet, and was previously used by the American Cancer Society as a housing facility for medical patients. Plaintiff plans to use the Summer Street Property for one commercial unit, the use of which has not yet been determined; seven one-bedroom apartments; and two two-bedroom apartments.

On October 8, 2019, Defendant denied Plaintiff's replacement cost claim because the Summer Street Property was not a "bona fide replacement" under the Policy. (Doc. 30-3 at 4.) It explained its rejection as follows:

> The proposed replacement property is not a bona fide replacement of like kind and quality because it possesses additional square footage over and above the insured premises. The proposed replacement property also is not a bona fide replacement of like kind and quality because it is for a different use, a medical building, as opposed to the insured premises which were a residential apartment building. In other words, the property located at 197 Summer Street, Buffalo, New York is not equivalent to the insured premises and the proposed replacement property would be a new, improved building by virtue of the fact that it possesses more square feet of space and would be used for a different purpose over and above what the insured premises possessed and was used for. In short, you have not presented a bona fide replacement-cost claim because the proposed medical building is a fundamental change, representing a betterment over the former 11-unit residential apartment building. Based on the foregoing, your replacement-cost claim as it relates to a purchase of 197 Summer Street, Buffalo, New York is denied in its entirety.

*Id.*

### B.    Loss of Business Income Claim.

The monthly rental payments Plaintiff received from the Breckenridge Street Property totaled $6,570.00. Plaintiff received no rental payments for the Breckenridge Street Property for the twelve months following the fire.

The Policy provides:

> (1)    Business Income
>
> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a

4

vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

    (a)    The portion of the building which you rent, lease or occupy; and

    (b)    Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage.

Business Income means the:

    (i)    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

    (ii)    Continuing normal operating expenses incurred, including payroll.

Ordinary payroll expenses mean payroll expenses for all your employees except:

    (a)    Officers;

    (b)    Executives;

    (c)    Department Managers;

    (d)    Employees under contract; and

    (e)    Additional Exemptions shown in the Declarations as:

        (i)    Job Classifications; or

        (ii)    Employees.

Ordinary payroll expenses include:

    (a)    Payroll;

    (b)    Employee benefits, if directly related to payroll;

    (c)    FICA payments you pay;

    (d)    Union dues you pay; and

    (e)    Workers' compensation premiums.

(2)    Extended Business Income

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

    (a)    Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

    (b)    Ends on the earlier of:

        (i)    The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

        (ii)    30 consecutive days after the date determined in (2)(a) above.

. . .

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(Doc. 29-2 at 9-10.)

"Operations" is defined as "your business activities occurring at the described premises." *Id.* at 27. "Period of restoration" is defined as the period beginning "72 hours after the time of direct physical loss or damage for Business Income Coverage" and ending "on the earlier of" either "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "[t]he date when business is resumed at a new permanent location." *Id.* at 27-28. The "[p]eriod of restoration" "does not include any increased period required due to the enforcement of any ordinance or law that[] [r]egulates the construction, use or repair, or requires the tearing down of any property[.]" *Id.* at 28.

## II.    Disputed Facts.

### A.    Replacement Cost Expenditures.

The parties dispute the amount Plaintiff actually spent to replace the Breckenridge Street Property with the Summer Street Property. Plaintiff claims it spent over two million dollars to renovate the Summer Street Property, citing the declaration of P. Joseph Braunscheidel, an adjuster it retained to assist in the claims process, who stated it was his "understanding" that Plaintiff "has incurred to-date over $2 million in renovation costs[,]" and the declaration of Nicholas Sinatra, a principal of Plaintiff, similarly attesting that Plaintiff "has incurred over $2 million in renovation costs[.]" (Docs. 30-35 at 8, ¶ 58 & 30-34 at 5, ¶ 34.)

Defendant claims the two-million-dollar renovation cost is "mere speculation and/or wildly self-serving estimations." (Doc. 33-1 at 9.) It further contends the amount is implausible in light of Mr. Sinatra's averment that, because of permitting, financing, and COVID-related delays, renovations to date only involved asbestos removal, tree removal, and "selective demolition." (Doc. 29-4 at 102-03.)

### B.    Loss of Business Income Claim.

The parties dispute whether Plaintiff's loss of business income was a result of the fire. Defendant claims that any loss of business income was caused by Plaintiff's actions "and/or actions outside of the control of both" Plaintiff and Defendant, in particular planning, permitting, financing, and COVID-related delays to resuming operations. (Doc. 29-5 at 7, ¶ 22.) Plaintiff counters those delays "are irrelevant as they only occurred after the 12-month period of restoration time frame already elapsed." (Doc. 36 at 11.)

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute

of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). "Where parties file cross-motions for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks, alterations, and citation omitted).

If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**B.    Whether Plaintiff Is Entitled To Payment of Replacement Cost.**

**1.    Whether Plaintiff Replaced the Breckenridge Street Property.**

The parties dispute whether Plaintiff actually replaced the Breckenridge Street Property, as required by the Policy to receive payment on a replacement cost basis. There is no dispute that Plaintiff purchased the Lafayette Road and Summer Street Properties following the fire. Nor is there any dispute as to their material characteristics.

Plaintiff "maintains that the Lafayette [Road] Property is, and always was, a bona fide replacement[,]" (Doc. 30-34 at 4, ¶ 27); however, there is no evidence in the record that it ever responded to Defendant's request for further information regarding the Lafayette Road Property. Consequently, Defendant never rejected the Lafayette Road Property as a bona fide replacement. Plaintiff instead submitted the Summer Street Property as an alternative replacement and both parties proceeded with the understanding that Plaintiff was proposing only the Summer Street Property as a replacement. Having chosen to abandon its submission of the Lafayette Road Property and substitute the Summer Street Property during the claims process, Plaintiff cannot now assert the Lafayette Road Property was wrongfully denied. As a result, the sole question is whether the Summer Street Property qualifies as a replacement under the Policy. *Id.*

The parties agree that New York law governs their dispute. *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.") (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). Under New York law, "insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012). "[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning[.]" *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007) (citations omitted). "The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." *See In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir. 1998) (citing *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d

82, 86 (2d Cir. 1998)).

"As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." *Id.* (quoting *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Olin Corp.*, 704 F.3d at 99 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion[.]" *White*, 878 N.E.2d at 1021 (alterations adopted) (internal quotation marks and citations omitted).

The terms "replaced" and "replacement" are not defined in the Policy. As Defendant concedes, the provision of the Policy limiting replacement cost to "[t]he cost to replace, on the same premises, the lost or damaged property with other property: i. Of comparable material and quality; and ii. Used for the same purpose[,]" (Doc. 29-2 at 20), "merely establishes the limits of coverage[.]" *Kumar v. Travelers Ins. Co.,* 627 N.Y.S.2d 185, 187 (4th Dep't 1995). The provision is

> a theoretical or hypothetical measure of loss: that is, the replacement cost of rebuilding the identical structure as one limit of the company's liability. *This particular limitation does not require repair or replacement of an identical building on the same premises*, but places that rebuilding amount as one of the measures of damage to apply in calculating liability under the replacement cost coverage. The effect of this limitation comes into play when the insured desires to rebuild either a different structure or on different premises. In those instances, the company's liability is not to exceed what it would have cost to replace an identical structure to the one lost on the same premises. Although liability is limited to rebuilding costs on the same site, the insured may then take that amount and build a structure on another site, or use the proceeds to buy an existing structure as the replacement, but paying any additional amount from his or her own funds.

*Hess v. N. Pac. Ins. Co.*, 859 P.2d 586, 588 (Wash. 1993) (emphasis supplied) (quoting Jordan, *What Price Rebuilding?*, 19 The Brief 17 (Spring 1990)); *accord Kumar*, 627

N.Y.S.2d at 187; *Plantz v. Wayne Co-op. Ins. Co.*, 773 N.Y.S.2d 635, 635 (4th Dep't 2004).

While neither party argues "replaced" is ambiguous, they advance different interpretations of that term. Plaintiff argues that a property can be "replaced" with any property that is functionally similar. Defendant contends that a replacement must not only be functionally similar but also "of like kind and quality[.]" (Docs. 29-6 at 9 & 35 at 4.) In its denial of Plaintiff's replacement cost claim, Defendant appears to require "a bona fide replacement of like kind and quality" that is "equivalent[,]" and does not have "more square feet of space[,]" "fundamental change[s]," or a "different use[.]" (Doc. 30-3 at 4.)

"[B]ecause the [P]olicy contains no definition of the term, and the arguments of both parties appear at least plausible," the Policy is ambiguous as a matter of law. *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999) (holding the term "claim," undefined in the policy, was ambiguous). In this case, there is no extrinsic evidence of the parties' intent. *See Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1073 (2d Cir. 1996) ("Summary judgment may be proper in a contract action . . . if the contract is ambiguous but there is no relevant extrinsic evidence of the parties' actual intent.") (citations omitted). In such circumstances, the court may resolve the ambiguity as a matter of law "by applying the definition gleaned from the case law" or construing it "in favor of coverage and against the insurer, because as the drafter of the policy the insurer is responsible for the ambiguity." *Andy Warhol Found. for Visual Arts, Inc.*, 189 F.3d at 215. Both approaches lead to the same outcome here.

"It is settled law in New York that[] replacement cost coverage inherently requires a replacement (a substitute structure for the insured) and costs (expenses incurred by the insured in obtaining the replacement)[.]" *Alloush v. Nationwide Mut. Fire Ins. Co.*, 2008 WL 544698, at *3 (N.D.N.Y. Feb. 26, 2008)) (alterations adopted) (internal quotation marks omitted) (quoting *Woodworth v. Erie Ins. Co.*, 2006 WL 140798, at *5 (W.D.N.Y. Jan. 17, 2006)); *see also Harrington v. Amica Mut. Ins. Co.*, 645 N.Y.S.2d 221, 225 (4th Dep't 1996). While New York courts have not squarely addressed how similar a property

must be to constitute a "replacement (a substitute structure for the insured)[,]" *id.*, every federal district court to consider the question under New York law has concluded that only functional similarity is required. *See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props.*, LLC, 445 F. Supp. 2d 320, 334 (S.D.N.Y. 2006) ("In assessing whether rebuilt property constitutes a replacement, courts have determined that 'functional similarity' between the property destroyed and the replacement property is all that [replacement cost coverage] requires."); *Rutkovsky v. Allstate Ins. Co.*, 2019 WL 10248105, at *5 (S.D.N.Y. Oct. 29, 2019) ("Functional similarity between the property destroyed and the replacement property is all that is required.") (alterations adopted) (internal quotation marks omitted) (citing *SR Int'l Bus. Ins. Co. Ltd.*, 445 F. Supp. 2d at 334); *Matos v. Peerless Ins. Co.*, 2017 WL 444687, at *11 (W.D.N.Y. Feb. 2, 2017) ("[T]he insured may replace the premises with a property with similar functionality at another location.") (citing *SR Int'l Bus. Ins. Co. Ltd.*, 445 F. Supp. 2d at 334); *see also Harrington*, 645 N.Y.S.2d at 224 ("[T]he new structure does not 'replace' plaintiff's home; plaintiff does not live there."). The "vast majority of cases that have examined this issue" in other jurisdictions have reached this same conclusion. *See Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501*, 261 S.W.3d 861, 864 (Tex. App. 2008) (collecting cases); *see also* 12A Couch on Ins. § 176:65 (3d ed. 2022) ("[N]ot all versions of the replacement cost provision invoke requirements that the new property be identical or similar. . . . When similarity is required, and the replacement is purchased at a different location, functional similarity is all that has been required to conclude that the new property replaced the old.").

Whether construing "replaced" in favor of Plaintiff or "applying the definition gleaned from the case law[,]" *Andy Warhol Found. for Visual Arts, Inc.*, 189 F.3d at 215, as a matter of law, the term "replaced" in the Policy requires only functional similarity.

Defendant argues that the Summer Street Property is not even functionally similar to the Breckenridge Street Property because it was previously used as a medical building and contains a commercial unit. Defendant cites a Texas court's conclusion that a commercial office park was not a replacement for a residential apartment complex, *see*

*Fitzhugh 25 Partners, L.P.*, 261 S.W.3d at 865, and an Indiana court's conclusion that "four condominiums that would be used for residential purposes" were not replacements for "a single-story building that was leased to a tenant who used the building for commercial retail purposes." *Seeber v. Gen. Fire & Cas. Co.*, 19 N.E.3d 402, 413 (Ind. Ct. App. 2014) (citing *Fitzhugh 25 Partners, L.P.*, 261 S.W.3d at 865). These cases are clearly inapposite.

The Summer Street Property was most recently used as housing for patients who did not require hospitalization. It contains nine residential units and one commercial unit, the use of which has not yet been determined. It has the same number of bedrooms as the Breckenridge Street Property and is approximately the same age. The Summer Street Property is larger in terms of square footage, but that alone does not make it functionally dissimilar. *See Rutkovsky*, 2019 WL 10248105, at *5 ("Courts have held that a 'different kind of home' or 'a far larger building' at a different location can be a 'functionally similar' replacement.") (quoting *SR Int'l Bus. Ins. Co. Ltd.*, 445 F. Supp. 2d at 334 (collecting cases)). While the Summer Street Property is not functionally *identical* to the Breckenridge Street Property, it is functionally *similar*.

Because the Summer Street Property is functionally similar to the Breckenridge Street Property, Plaintiff "replaced" the Breckenridge Street Property within the meaning of the Policy.

## 2.   Calculation of Replacement Cost.

Under the Policy, the replacement cost of the Breckenridge Street Property is limited to the lesser of: (1) the limit of the Policy that applies to the Breckenridge Street Property, which the parties agree is $868,498.00; (2) "[t]he cost to replace, on the same premises, the lost or damaged property with other property: i. Of comparable material and quality; and ii. Used for the same purpose[,]" which the parties agree is $747,368.59; or (3) "[t]he amount that [Plaintiff] actually spen[t] that is necessary to repair or replace the lost or damaged property[,]" which the parties contest. (Doc. 29-2 at 20.) Defendant argues that, after an adjustment based on square footage, Plaintiff did not actually spend more than the actual cash value and is therefore not entitled to any additional payments.

The parties do not dispute that Plaintiff paid $825,000.00 to purchase the Summer Street Property. Defendant nonetheless contends that because of "the vast square footage disparity between the [Breckenridge Street Property] and the [Summer Street] Property," the amount spent should be adjusted based on square footage, which, according to Defendant, results in an adjusted purchase price of $384,938.40.[1] (Doc. 29-6 at 16-17.) It argues this adjustment is necessary to prevent Plaintiff from recieving a windfall. It further asserts that because the adjusted purchase price is less than the actual cash value, Plaintiff is not entitled to any additional payment for replacement cost under the Policy.

Although Defendant's approach based on square footage may make sense in some circumstances, the Policy does not require it. The plain meaning of "actually spen[t]" is the total amount expended. Defendant cites no authority from New York or elsewhere construing similar contractual language to require an adjustment based on square footage. *Contra Harrington*, 645 N.Y.S.2d at 225 (defining the "costs" that are "inherently require[d]" for replacement cost coverage as "expenses incurred by the insured in obtaining the replacement" without reference to any adjustment); *Kumar*, 627 N.Y.S.2d at 187 (holding "purchase of a house for $110,000" was not an "expenditure greater" than the "$123,000 limit of liability" without adjusting for difference in size).

"[T]he parties to an insurance policy, like the parties to any contract, are free to determine the terms of their arrangement." *Appalachian Ins. Co. v. Gen. Elec. Co.*, 863 N.E.2d 994, 1000 n.3 (N.Y. 2007). If Defendant wanted to provide for adjustments to replacement cost based on square footage, it "need only include language expressing that intent." *Id.* In the absence of such a provision, the court "may neither rewrite, under the

---

[1] Defendant supports this conclusion by (1) calculating the approximate cost per square foot of the Summer Street Property ($825,000 divided by 11,848 square feet, which equals approximately $69.63 per square foot; the actual cost per square foot is between $69.63 and $69.64); (2) multiplying the approximate cost per square foot of the Summer Street Property by the difference in square footage between the Summer Street Property and the Breckenridge Street Property ($69.63 per square foot times 6,320 square feet, which equals $440,061.60); and (3) subtracting that total difference in cost based on square footage from the purchase price ($825,000 minus $440,061.60, which equals $384,938.40). (Doc. 29-6 at 16-17.) Defendant "does not concede" that its calculations "are accurate or correct." *Id.* at 16 n.2.

guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) (citations omitted) (discussing New York law); *see also Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1283 (N.Y. 1978) ("This court may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation[.]") (citations omitted). The Policy imposes limits to prevent a windfall; it caps Defendant's liability at $747,368.59, regardless of how much Plaintiff actually spends on a replacement property.

Because Plaintiff "actually spen[t]" at least $825,000 to replace the Breckenridge Street Property, Plaintiff is entitled to recover the holdback amount of $253,630.77, the difference between the replacement cost ($747,368.59) and the actual cash value ($493,737.82). For the foregoing reasons, Plaintiff's motion for summary judgment as to Count I is GRANTED and Defendant's motion for summary judgment as to Count I is DENIED.

## C.   Whether Plaintiff Is Entitled to Lost Business Income.

Plaintiff argues that Defendant has wrongfully failed to pay Plaintiff lost business income in the amount of $35,156.00, which Plaintiff arrived at "by calculating the total projected rent for one year (i.e. the applicable policy limit for business interruption), subtracting the discontinuing expenses as a percentage of income, and applying the percentage to the projected rental income to calculate the projected loss of income for that year." (Doc. 30-35 at 10, ¶ 75.) Defendant contends that delays to the resumption of Plaintiff's operations were the result of Plaintiff's lack of diligence in identifying a replacement property as well as planning, permitting, and COVID-related difficulties. Defendant argues Plaintiff is not "automatically entitled to an entire year of rent and, as such, summary judgment is inappropriate." (Doc. 33-1 at 12.) Plaintiff responds that "[t]hese 'delays' are irrelevant as they only occurred after the 12-month period of restoration time frame already elapsed" because Plaintiff did not "submit[] . . . proposed replacement[s]" until over eighteen months after the fire. (Doc. 36 at 11-12.)

The Policy covers lost business income until the time when the Breckenridge

Street Property "should be repaired, rebuilt or replaced with reasonable speed and similar quality" and "does not include any increased period required due to the enforcement of any ordinance or law that[] [r]egulates the construction, use or repair, or requires the tearing down of any property[.]" (Doc. 29-2 at 28).

> The theoretical period of restoration is the length of time needed to replace or repair the damaged property in the exercise of due diligence and dispatch. Thus, the insured will not recover for any additional contingent business interruption loss beyond the theoretical period in the absence of expanded coverage. The theoretical period can terminate while the insured is still losing sales.

*Lava Trading Inc. v. Hartford Fire Ins. Co.*, 365 F. Supp. 2d 434, 442-43 (S.D.N.Y. 2005) (alterations adopted) (quoting *Business Interruption Insurance Current Issues*, 702 Practicing Law Institute/Litigation 233, at 253–54 (2004)).

Plaintiff closed on both the Lafayette Road Property and Summer Street Property in 2018. Plaintiff maintains that both properties are functionally similar to the Breckenridge Street Property but does not explain why it could not have resumed operations at those properties. Moreover, Plaintiff does not address Defendant's argument that the delay in purchasing and resuming operations at a replacement property was itself beyond the hypothetical time period it should have taken to resume operations at the Breckenridge Street Property. For those reasons, there are genuine issues of material fact as to whether Plaintiff is entitled to loss of business income coverage based on a full year's rent.

Plaintiff's motion for summary judgment as to Count II is therefore DENIED and Defendant's motion for summary judgment as to Count II is also DENIED.

### D.   Whether Plaintiff Is Entitled to Consequential Damages.

Defendant moves for summary judgment on Plaintiff's claim for consequential damages because it asserts there is no evidence of bad faith on its part. It argues any delay was due to factors beyond its control. It notes Plaintiff waited until twenty months after the fire to submit the Summer Street Property as a replacement property and thereafter experienced planning, permitting, and COVID-related delays.

Under New York law, consequential damages are available only when they "have

been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting[.]" *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008) (citation omitted). In *Bi-Economy*, the New York Court of Appeals held that where a policy provides for business interruption coverage and an insured "suffers additional damages as a result of an insurer's excessive delay or improper denial, the insurance company should stand liable for these damages. This is not to punish the insurer, but to give the insured its bargained-for benefit." *Id.* at 132. The benefit is "the peace of mind, or comfort, of knowing that it will be protected in the event of a catastrophe[.]" *Id.* at 131 (citation omitted). This is because "the purpose of the contract was not just to receive money, but to receive it promptly so that in the aftermath of a calamitous event, as [plaintiff] experienced here, the business could avoid collapse and get back on its feet as soon as possible." *Id.* at 132. The insurer has an obligation "to evaluate a claim, and to do so honestly, adequately, and—most importantly—promptly." *Id.* Because the insured party's "claim for consequential damages including the demise of its business, was reasonably foreseeable and contemplated by the parties, [it] cannot be dismissed on summary judgment." *Id.* at 132.

As in *Bi-Economy*, the Policy's loss of business income coverage anticipates that payment will be made promptly following a covered loss. The fire occurred in September 2017, but Defendant has yet to pay Plaintiff's loss of business income claim. The court agrees with Plaintiff that "genuine issues of fact exist regarding the Defendant's failure to investigate, evaluate, and pay [Plaintiff's] claim 'honestly, adequately, and—most importantly—promptly.'" (Doc. 34-3 at 27) (quoting *Bi-Economy*, 886 N.E.2d at 132). For that reason, Defendant's motion for summary judgment as to Count III is DENIED.

While Plaintiff moves for "judgment as a matter of law as to liability on all its causes of action[,]" (Doc. 30 at 1), Plaintiff does not adequately address Count III in its briefing and cites no support in the record for its claim. *See* Local Rule 56(a)(1) ("Failure to submit such a statement may constitute grounds for denial of the motion."); Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record[.]").

Plaintiff's motion for summary judgment as to Count III must therefore also be DENIED.

### E. Whether Plaintiff Is Entitled to Prejudgment Interest.

Plaintiff seeks prejudgment interest on the $253,630.77 replacement cost holdback, which Defendant opposes. Under New York law, an award of prejudgment interest is mandatory in a successful breach of contract action. N.Y. C.P.L.R. § 5001(a) ("Interest *shall be recovered* upon a sum awarded because of a breach of performance of a contract[.]") (emphasis supplied); *see also Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 282 (2d Cir. 2013) ("Section 5001(a) provides for a mandatory award of prejudgment interest in certain actions, including those for breach of contract[.]"); *U.S. Fire Ins. Co. v. Fed. Ins. Co.*, 858 F.2d 882, 888 (2d Cir. 1988) ("[Section] 5001(a) requires an award of such interest as of right if a plaintiff receives his award 'because of a breach of performance of a contract[.]'").

Interest must be "computed from the earliest ascertainable date the cause of action existed[.]" N.Y. C.P.L.R. § 5001(b). "In contract actions, the task is to ascertain the date of the breach." *Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 393 (S.D.N.Y. 2013); *see also Brushton–Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 692 N.E.2d 551, 554 (N.Y. 1998) ("The award of interest reflects a recognition of the principle that damages are properly ascertained as of the date of the breach and a recognition that there may be a time lag between the accrual of a plaintiff's cause of action and the resulting damage sustained and actual payment by defendant[.]"); *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 845 (2d Cir. 1993) ("In order to provide the successful claimant with complete indemnification, prejudgment interest must be awarded from the date of the adjudicated deprivation."). "[T]he date from which interest is to be computed is a question of fact, generally to be determined by a jury, but also determinable by 'the court upon motion'." *Ginett v. Comput. Task Grp., Inc.*, 962 F.2d 1085, 1101 (2d Cir. 1992) (quoting N.Y. C.P.L.R. § 5001(c)); *see also In re Johns-Manville Corp.*, 759 F.3d 206, 220 (2d Cir. 2014) ("A court's decision to award prejudgment interest running from a date certain is a question of fact,[] subject to reversal only if clearly erroneous.") (citing *Ginett*, 962 F.2d at 1101).

Plaintiff argues that the earliest ascertainable date is September 24, 2017, which it asserts is the date of the fire. (Doc. 30-1 at 4, ¶ 11). In the alternative, Plaintiff argues that the earliest ascertainable date is April 9, 2019, the date it submitted the Lafayette Road Property as a replacement.

Defendant claims that the fire occurred on or about September 23, 2017, (Doc. 29-5 at 2, ¶ 3), as alleged in Plaintiff's Complaint, (Doc. 1-1 at 4-5, ¶¶ 1, 12.) However, Defendant contends no payment is required until after entry of a final judgment because the Policy only requires payment thirty days after Defendant "receive[s] the sworn proof of loss" *and* "reach[es] agreement with [Plaintiff] on the amount of loss" or "[a]n appraisal award [is] made." (Doc. 29-2 at 22.). Defendant asserts no agreement or appraisal has been made.

Courts have rejected Defendant's argument that a contractual loss payment provision[2] "trumps New York law" and precludes prejudgment interest. *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 640 (2d Cir. 1995) ("We reject this construction of the policy. The provision does not even mention pre-judgment interest. It merely establishes the time when [the insurer] must pay [the plaintiff]'s claim. It does not address the question of how the amount of the claim is to be calculated."); *see also State Farm Ins. Co. v. Domotor*, 697 N.Y.S.2d 348, 350 (2d Dep't 1999) ("An insurance carrier may not, after repudiating liability, create grounds for its refusal to pay by demanding compliance with proof of loss provisions of the policy."); *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 152 (2d Cir. 2017) ("It is not the intention of § 5001(b) that an insurer could deny coverage for years in the face of reasonable demands and then, once it is adjudicated liable, avoid paying any prejudgment interest."). Because the court has found that Defendant is liable for a breach of contract, the cases Defendant relies on are

---

[2] Defendant does not assert that the Policy's loss payment provision was a clear and express waiver of statutory prejudgment interest. *See Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) ("[P]arties may contract around that right [to statutory prejudgment interest], but to be valid, a party's waiver thereof must be clear and express[.]") (citing *J. D'Addario & Co. v. Embassy Indus., Inc.*, 980 N.E.2d 940, 943 (N.Y. 2012)).

inapposite.[3]

Because the Policy allows Defendant at least thirty days to make payment after a proof of loss is submitted, neither the date of the fire nor the date the Lafayette Road Property was submitted as a replacement should be used to calculate prejudgment interest. *See Granite Ridge Energy*, 979 F. Supp. 2d at 393 ("Where the contract is an insurance policy providing that the insurer will make payment within a certain time after the insured submits a proof of loss, the date when payment is due is an 'ascertainable date' for the existence of a cause of action.") (citation omitted); *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 443 (S.D.N.Y. 2016) (holding interest accrued from 30 days after submission of proof of loss, which is when contract required payment).

In addition to the uncertainty regarding the date from which interest should run, the parties have not briefed the applicable rate of interest, which "varies depending on the nature and terms of the contract." *NML Cap. v. Republic of Argentina*, 952 N.E.2d 482, 488 (N.Y. 2011). While Plaintiff moves for prejudgment interest as to Count I only, Counts II and III are also breach of contract claims for which prejudgment interest is requested in Plaintiff's Complaint. Against this backdrop, addressing prejudgment interest after the resolution of all counts would further the "just, speedy, and inexpensive determination of [this] action[.]" Fed. R. Civ. P. 1.

For the foregoing reasons, Plaintiff's request for prejudgment interest is DENIED WITHOUT PREJUDICE. Plaintiff may renew its motion after Counts II and III have been resolved.

---

[3] *See, e.g.*, *Ginsburg v. Charter Oak Fire Ins. Co.*, 971 N.Y.S.2d 573, 574 (2d Dep't 2013) ("Charter Oak timely paid the plaintiffs the amount of $508,304.17 within 60 days of the filing of the appraisal award. Accordingly, *it did not breach the insurance contract* in this regard[.]") (emphasis supplied); *Caiati of Westchester, Inc. v. Glens Falls Ins. Co.*, 696 N.Y.S.2d 474, 475 (2d Dep't 1999) ("Based on the unambiguous terms of the 'loss payment' provision of the subject insurance policy, the defendant, Glens Falls Insurance Company[], was not obligated to pay the disputed amount of the plaintiff's loss until 30 days after the appraisal award was made. Since Glens Falls timely paid the appraisal award, *it did not breach the insurance contract*[.]") (emphasis supplied).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 30) is GRANTED IN PART and DENIED IN PART and Defendant's motion for summary judgment (Doc. 29) is DENIED.

SO ORDERED.

Dated this 26ᵗʰ day of August, 2022.

Christina Reiss, District Judge
United States District Court